May it please the court, I'd like to begin with the obviousness issue. The trial court in this case never compared the claims limitation by limitation to the prior art. Instead what the trial court did was to rewrite the claims which it accepted. It expressly found to be, in its words, difficult to understand to a simpler format that lacked key limitations present in the actual claims of the patent. And that was an egregious error because the limitations that the trial court wrote out in rewriting the claim were the same limitations that we argued were not present in the prior art and that showed the patentability and the validity of the patent. So what's the difference between this and Seeger? I mean, one of the differences you rely on is that Seeger was used to connect one muntin bar to another. Let's assume that we agree with the district court that that would be reasonable for somebody to assume that you could use it to attach a muntin bar to a frame. What other differences are there between this and Seeger? One of the differences is that the trial court did not find, and it is not the case, that there is a relatively rigid latch body member in Seeger. In fact, both the parts that correspond to the relatively rigid latch body member and the resiliently deflective finger, they are both resilient and both deflect in the case of Seeger. It's important, Your Honor, and I'm talking now about the 7.61 patent and I have an additional answer on the 3.77 patent. In the 7.61 patent, there are three parts to the clip. There is the clip body, which is the flat part that rests against the flanges. There's the support member that holds the muntin bar, and then there's the latch means that actually affixes or holds the clip to the body. In Seeger, Seeger has two portions that go out from what would be the clip body, and they turn around like a hook and they come back. On side view, they appear to have about the same thickness, and you can see from the commercial embodiment that they are rather flimsy, or certainly they appear to be deflectible. The trial court found in its analysis of the facts that the entirety of that hook, the part that goes out and the part that comes back, was resilient and deflected when Seeger was put into the boreholes that it was inserted into. The claims require that the part that goes out, which is the relatively rigid latch body, be relatively rigid compared to the resiliently deflectible finger, so that only the deflectible finger actually deflects. A second difference, of course, is that Seeger does not show a spacer frame with spaced-apart stiffening flanges that define an abutment. This is a key limitation that was never considered by the court, and yet is important to define stability of the latching means that was invented by Mr. Leopold. So as to the 761 patent, Seeger didn't have either of those two requirements, and nothing that the trial court tried to do to patch those gaps actually did it. Pandell did not have stiffening flanges that defined an abutment. It arguably, at best, may have had stiffening flanges, but there was nothing that provided an abutment that would prohibit something like Seeger from sliding up and down in the middle of the track. So why are these differences significant? Because they go to the heart of the matter. Here's what Mr. Leopold was faced with. The concept of the invention is to have supporting flanges, stiffening flanges, that are spaced apart so that there's no heat transfer. Wasn't the idea to be able to get up muntin bars inside the U-shaped warm-edged spacer? Well, right. And of course, all the— U-shaped spacers were in the art. Everybody knew about that, just for glazing purposes, right? And everybody knew about rectangular frame edges that had muntins in them and how to make that attachment. I would disagree. Well, those things are in the art. I would disagree that U-shaped spacer frames are in the art, Your Honor. The art consistently refers to box-shaped spacer frames. And, for example, Pandell chose a little bit of a gap on the inside. Right, but the purpose for the gap is to let the air come through, right? Accepting all of that, Your Honor— You make a little larger U-shaped, your gap's a little larger. But, I mean, there are lots of pieces of prior art that have got a gap that lets the air come through. There certainly are pieces of prior art that show a gap. And those achieve the stopping the heat transfer? I disagree with that part, but I will agree that there are pieces of prior art that show a gap. However, none of the pieces of prior art that arguably show a gap that the trial court relied on showed any method of affixing any kind of a muntin bar in. And, in fact, the prior art latches that the court was looking at all have one latch sitting right in the middle. As our expert pointed out, if you take a latch that's sitting in the middle and you plug it into a spacer frame that has a gap in the middle, there's nothing to hold onto. That is the fundamental invention that Mr. Leopold tried to address. He had to figure out a way to attach the end clip of the muntin bar to a spacer frame where there was nothing in the middle. So you use Seeger, you just turn it upside down and use Seeger? I'm sorry? You take Seeger's little hooks at the bottom and just turn them around the other way and plug it up and they reach over and hang over the edge. I'm not sure how that would work. If you took Seeger the other way and you pushed it down, for example, into Pandell, then what would happen? First of all, you would have to rotate the tree around 90 degrees so that it would hold the muntin bar the right way. But there would be nothing to stop it. It wouldn't be very hard to do. Well, that wouldn't be hard to do, but then how are you going to stop it from sliding up and down the length of the... That's the abutment requirement, Your Honor. That's the stiffening flange defining an abutment. I looked at your expert report and he seems to talk mostly about it's easier to manufacture this thing rather than that somehow there's something structurally unique about the way this was done. There are a number of reports and they're all very long on both sides. He certainly talks about what Your Honor suggests, but there's an important point where he talks about all of the things that you would have to do to take the prior art relied on by the trial court and morph it into the invention of Leopold. You would have to change the relative sizing of the tree versus the clip. You would have to... Yeah, but what I didn't see in his affidavit was any suggestion that this was beyond someone of skill in the art, which seemed to be why he was addressing the manufacturing process. Am I wrong? Does he say that someone skilled in the art wouldn't know how to do this? Oh, yes. I think he explicitly says he understands the requirements for obviousness and he finds that these are not obvious because it would not have been apparent to an engineer with the requisite amount of experience to do these morphological changes. Where does he say that? I don't immediately have a citation to the... but I know that we cite in our blue brief a quotation that includes those conclusions that he reached and I'll try to find that when I address it in the rebuttal, Your Honor. And then turning to the 377 patent, that has the additional requirement of having two pairs of latching locations where the latching locations are spaced outside of the plane that would be described by the edges of the mutton holding member. Again, something not discussed by the court and something not shown at all in the prior art. The best that the defendant could do to create that sort of invention was to combine the dimensions of a different patent, use those dimensions in the Lingeman situation. How did you find the two pairs in the alleged accusing clips? We found them exactly the same way, Your Honor, that the defendant found two pairs of latching locations in the Lingeman prior art reference. And that is... Well, that would be sort of unfortunate for you because it sort of suggests that if you could find it in their product, they could permissibly find it in the prior art. Well, Your Honor, there are a lot of other reasons why Lingeman doesn't show our intention. Let's just stick with the pair of latches for a second. It seemed to me that your infringement theory with regard to the pair of latches did you in on the claim that the prior art didn't teach pair of latches, which is the point that Judge Dyke was making, I think. Well, that issue wasn't considered by the court in going through its analysis. But beyond that, Lingeman lacks a lot of things that are necessary. For example, even if there are two pairs of latching locations on Lingeman, which would be consistent with our infringement theory, that's true, those latching locations are not outside of the plane of the... You made reference earlier that the district court didn't write a 70-page opinion going through a lot of claim limitations and extensive quotations to the prior art. But for purposes of us, for reviewing the judgment as opposed to the opinion, if everything is in the record in order to sustain the district court, and the district court didn't make any error of law, then we could affirm, couldn't we? Even though we might agree with you that the opinion could have been more... Your Honor, I would disagree with that for this reason. KSR says that when a district judge, on summary judgment, is going to look at various pieces of prior art and put the puzzle together, that there must be an explicit statement of the reasoning that the court utilized. In this case, there was no explicit statement addressing these various limitations because the limitations themselves weren't addressed. And on top of it, when the trial court did address this issue, trying to make an explicit finding, the trial court made findings that were not supportable. The worst one, if I had to pick one, was the finding that an engineer would recognize that the Seeger boreholes operate in the same way as the stiffening flanges of the patent. That's wrong on three different grounds. First of all, there wasn't any explanation for how a borehole can be the same thing as a stiffening flange. Secondly, the borehole is a negative structure. The stiffening flange is a positive structure. And as a third argument, the prior art that the court used never showed a clip used with a wall having a gap in the middle. And so there was no way that the court was able to link the idea of using links or catches that would be used with boreholes to a catch that might be used with a stiffening flange. So none of that was said. Why don't we let you save your messy rebuttal time. That's all welcome. I've heard of the brief. Okay. Very well. And we'll hear from Mr. Monahan. We'll give you the rest of your time back. Thank you, Your Honor. May I please report? This is a summary judgment. Case. Your district judge did seem to be making an awful lot of findings of fact on summary judgment. You're saying the district court did or did not? Did. I don't know, Your Honor. You probably have a better viewpoint on that from seeing so many cases. It appeared to me that the district court judge understood the prior art and applied it properly. By the way, Timothy Monahan, Ford Duratec. May I please report? Well, if he did make a lot of findings of fact on material matters, then this at least has to be vacated and sent back, doesn't it? Well, I believe he did make findings of fact as to certain aspects of the prior art that satisfied the claim limitations. You can't do that on a summary judgment, can you? I don't know the answer to that, Your Honor. Pardon? I don't know the answer to that, Your Honor. I mean, shouldn't there be a trial if there are disputes of significant facts? Well, if there is a dispute as to significant facts that are required for the judgment, that would be the case. But from my understanding of the way that this summary judgment was found, that the facts the judge relied on were not in dispute. And I'll give you a good example.  That the facts where the court did rely on them, the findings that the court relied on, were not in dispute. And I was going to give you an example, and that's with the 377 patent, for example. In that case, the judge relied on the Lingaman reference, and at the Markman hearing, the GED Newell's expert found, conceded, that the latching mechanism was that there were two fingers, that they each defined two latching locations. And so that met quite a few of the claim limitations right there. That was something that was not in dispute. And then the other issue is, well, in order to modify the Lingaman reference, you have to put the Lingaman reference with a tree that's not as wide as the tree that engages the mutton bar that's shown in the Lingaman reference. Well, all of the experts in the case agreed that the tree is interchangeable with the base and the latching mechanism as desired. Dr. Casmer, the plaintiff's witnesses, found that. The expert from Newell who testified found that, as well as a Duratex expert. They're interchangeable as you like. And this is an aesthetic feature. The rectangular mutton bars were known. The one reference record that's relied on to show the dimensions of a 3-16th inch mutton bar showed that this type of mutton bar has a width of about 3.5 millimeters. But they're not really, I think, disputing the upper portion of this attachment feature. They're saying the bottom portion, the clip, is not found in the prior art. Do you have the same understanding that I do? With regard to the 377 patent... No, no. Do you agree with that? They seem to agree that the upper portion of it, the tree portion of it, was found in the prior art. They don't seem to dispute that applying that tree to a different form of clip would be an obvious modification to make. They seem to be focusing on the differences between the clip portion, that is the bottom portion, and the prior art. They've identified certain differences there which they say are different and it wouldn't be a motivation to change those. My understanding was that when Mr. Shunk made those arguments, he was talking about the 761 patent, not the 377 patent. In the 377 patent, those claims, I believe I just heard Mr. Shunk concede that the Lingerman reference showed two latching locations on each prong and that the only issue was the width. But I'll be glad to address the issue of the 761 patent. The 761 patent, in order to find invalidity, the court relied upon the Seeger reference. That's a different reference. And G.E.D. Newell has disputed whether what's shown and claimed in the Leopold reference is the same as Seeger reference. And I would refer the court to our gray brief, page 23, where we've done a side-by-side comparison of what was disclosed and claimed in Leopold and was disclosed and claimed in Seeger. It appears they were written by the same person. They're virtually identical. Now, with regard to the 761 patent, the Seeger reference was not combined with a hollow bar that had spaced apart stiffening flanges. But, of course, spacer frames with spaced apart stiffening flanges were well known in the art. We've cited about eight different references on that. So the question that I submit before the court is, would it be obvious, could a skilled person combine those two? And I would direct the court's attention to page 36 of our red brief, where Durotek's expert has kind of shown what this combination would look like. In fact, the Seeger clip would work the same, whether there was a slot going across the spacer frame or whether there wasn't. It would work the same. And that was our argument. Now, in terms of, well, what about with wider spacer frames? For one thing, what we've maintained is the distance between the spacer frames is not part of the claim. In fact, there's no distances even disclosed in the 761 and 377 patent. No dimensions whatsoever. So that it would be inappropriate for someone to distinguish from the prior art references showing spaced apart stiffening flanges based upon the distance. The claim says just spaced apart. And the only party that's weighed in, so there is no dispute on this issue as well, what does spaced apart mean is the statement from Durotek's expert. And Durotek's expert said, spaced apart means, in the context of this reference, was that they don't touch and they don't overlap. And when you put those together, it's shown in the drawing on page 36, and it would work the same. Now, in terms of arguments, well, what if the gap between the stiffening flanges was greater? Wouldn't the Seeger clip fall out? Well, okay, if you made the space greater, the clip would fall out. But we're talking about one thing that the parties did agree on, and this is another undisputed fact, is the level of skill in the art. The level of skill in the art is a mechanical engineer with three years' experience, a chemical engineer with five years' experience. I'm not sure why a chemical engineer is a little slower to catch on, but this is the level. So the situation is, if you made the gap a little bit more, you wanted to make the gap a little bit more, and the clip fell out, well, you'd make the finger, the latching mechanism, a little wider, too, to go with it. That is the level of skill required in order to put these together with any distance between the stiffening flanges. But again, that's not part of the claim either, the distance between the stiffening flanges. So based on those two issues, I think the court was correct in finding that this invention was obvious. Of course, there's another issue in the case, and that is, and I will address one thing also, and there's arguments being made that the secondary indicia of non-obviousness, the commercial success, makes this invention non-obvious. I've addressed that fully in our brief, and basically what we find is that there's an umbrella of patents dealing with the machinery that make these spacer frames. These patents are either owned or exclusively licensed to GED's customers, and it's under this umbrella that they operate. They admit that they've got a monopoly on this equipment. They also admit that when they sell this equipment, they tell the customers, you need to buy the clips from our distributor Newell. And so what we have here is a monopoly power telling the customers they've got to get the clips from this particular source. There is no competition here, of course. We're not arguing that's an illegal monopoly, are you? This isn't an antitrust case? This is not an antitrust case, but in terms of talking about is this a case where the plaintiffs at GED Newell have shown that their commercial success is based upon the strength of their invention, I think this completely rebuts that argument. Your client's in the clip business, is that right? He is, Your Honor. I would like to move on to our counterclaim that we have in the case. And this counterclaim is that of unfair competition and state tort claims. And as a result of this, our client was damaged. We believe we've set out a prima facie case of unfair competition and tortious interference in business. There was admissions. There's testimony from the Duratec. It's all based on allegations that they told customers that you were infringing, right? Yes, and also threatening our sales representatives with infringement, but it all derives out of that. So obviously we have to show that there was bad faith involved, that there's this additional requirement in the case of a patent case. And in terms of bad faith, there's a requirement that there be subjective bad faith and objective bad faith. Where we are maintaining that the district court erred is when they made a finding that there was no objective bad faith. And what the court decided there was that, well, you've got your expert, Mr. Kiesel, and you've got your technical expert saying that there is no infringement. A reasonable patent attorney would not find there be infringement. But on the other hand, the plaintiffs, the GED Newell, also have their experts, and their experts say... No, but I mean, we're sitting here. We hear this argument about validity. Are you suggesting that their claim that the patent's not invalid is in objective bad faith? Based on the court's prior decisions, objective bad faith can be found when a patent is obviously invalid, and I believe that this is the case here. So you want us to hold that the claim that it's not invalid is objectively unreasonable? Correct. That might be kind of difficult given the seemingly reasonable opposing positions of the parties here. Well, I think when this case, you've studied the facts, I think you'll agree that this is not a reasonable basis that the plaintiffs held. But I think also the other arguments we made was that no reasonable patent attorney would find infringement in this case, find there to be infringement. I mean, these are two very different clips. We've taken their concept, which was, and this is a snap fit, taken their concept where the latching mechanism is molded into the clip itself, and so that when you insert it, part of the clip deflects in order to engage and then snaps back to hold them together. Duratect turned it completely opposite. They've created a clip that is completely solid. There's no moving parts. One part doesn't move against the other. There's no finger, and there's no relatively rigid latch body member. And what they did was they used a spacer frame, which was flexible. And so they used the spacer frame's deflection to open up, allow the clip in, and it snaps back and holds the clip. And I have gone through a lot of detail, and I would refer the court to pages 66 and 75 of our red brief, where it talked in detail about the expert report that they put together. This expert report is a sham. It is done by a very sophisticated expert. He's got a lot of experience. He's gone through, and he has created the impression that he can prove that Duratect's clip works the same way as the claimed GED clip. It's like kicking a rotten log. When you take a look at the reasoning that he used to get there, you find that he didn't do any testing whatsoever. And in previous cases, this court has found bad faith based on the fact that there was no testing done but that a party tried to create the illusion of conclusions drawn from that. This is the case here. I'll give you an example. No testing done whatsoever, yet in Appendix 1456,  As a result of my analysis, I believe that the defendant's mutton-bar clips not only have a resiliently deflectible finger as required by the claim, but were purposely designed by the defendant to provide elastic behavior when interfaced with the spacer frame fashioned according to the patent specifications. I asked him at the Markman hearing, what tests have you done? He said, I'm not done yet. I said, you haven't done any, have you? He said, no, I haven't done any tests. He created this report in order to support the finding that there was infringement here. In fact, he didn't do anything. He didn't do any testing whatsoever. He drew a bunch of conclusions that the whole report is something that's going to be used to pull the wool over the jury's eyes, but there's nothing to it. I've set out the details in my report. I think that speaks for itself when you study that. Okay, thank you. Judge Dyke, you had asked me to provide you with a reference to where Dr. Kazimer had talked about the necessary and innovative changes needed in order to create the Leopold design based on the prior art. They can be found in the appendix from pages 3064 to 3066, and key portions of that are quoted in our brief in pages 34 and 35. Where exactly does he say it would be beyond the skill of someone skilled in the art to make the modifications there? He says at 3066, Leopold's invention. Which volume is this? I'm sorry? Which volume is this? That's in volume three, Your Honor. He says Leopold's inventions are not obvious in light of the prior art after he does this analysis, and earlier in his declaration he said that he understood the nature of obviousness under section 103, and he addresses what he believes to be the standard of skill of a person. Yeah, but that statement sounds kind of conclusive. He's not explaining why someone skilled in the art wouldn't know how to do this. Well, he does. He says, for example, Angstadt says that it's a straightforward combination of designs, and then picking up the quote on 3066. To the contrary, they require substantive changes in the form and function of the design, and then he goes on to explain, for example... Yeah, but I understand that. What he doesn't say is that those changes would be beyond the skill of someone skilled in the art. At page 3064, he says the low cost and high performance resulting from Leopold's inventions would not be predicted by one of ordinary skill when considering obvious combinations of the prior art. The low cost? I'm sorry? The low cost? Yes. Yeah, but that doesn't go to whether or not one skilled in the art could have made the changes thinking perhaps it would have been a high cost. I think the point Judge Dyke is asking is whether there was any explicit testimony or evidence that someone was saying, yes, these changes have to be made, and the person of skill in the art that's been specified for this field would not have been able to make those changes. Well, Your Honor, that's as explicit as I can get in pointing to the defendants to you. I believe that when you take into account Dr. Kastner's understanding of what 103 requires, his explanation of his findings and his conclusion, yes, he didn't say those explicit words, but that's the import of the conclusion he reaches. And I did want to address, Your Honor. Of course, we also have the possibility under those circumstances that maybe he didn't say it because he couldn't. That's a problem. Well, we don't know because, of course, this was decided on summary judgment and so the experts were never given an opportunity to be tested by cross-examination. You're supposed to put on a case that creates a fact issue on summary judgment. You can't hold back from the witness's testimony the thing that creates the fact issue. You're supposed to put it in then. I believe, Your Honor, that the conclusory statement with all of the necessary specific argumentation in front of it meets that requirement. And if I may, very briefly, I see that the red light is on, but I wanted to respond to one thing that counsel said with regard to... We gave you back your time, but you've got about a minute and a half now. Thank you. I wanted to respond to the point that the allegations made that Dr. Kastner did no testing. It is true he did not do the same kind of testing that Dr. Angstad did, but he did a finite element analysis of the clip and how it would move. So that rather than actually test the clip, he ran a computer program in which he modeled how the clip would act when various forces were put on it, and that was the basis of the conclusions that he reached. So that is a well-recognized alternative to doing the testing. The finite element analysis is used all the time in engineering, and in fact, when a Daubert motion was brought on the same basis by defendant, Judge Adams concluded that yes, finite element analysis was a perfectly reasonable way to approach the analysis of the case. And it is that that gives us the basis for saying that we had a perfectly reasonable basis for telling people that we believed to be infringers that in fact they did infringe. There is no basis for the counterclaims that were raised on appeal. Thank you very much, Your Honor. Thank you. The case is submitted.